# JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY & another[1] *vs.* JULIAN BANERJI.

Suffolk. September 6, 2006. - December 13, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Insurance,* Misrepresentation, Disability insurance, Unfair act or practice. *Contract,* Insurance, Misrepresentation, Emotional distress. *Consumer Protection Act,* Unfair act or practice, Insurance. *Damages,* Breach of contract. *Negligence,* Emotional distress. *Practice, Civil,* Attorney's fees.

An insured's application for future earnings protection (FEP) benefits under his preexisting disability insurance policy constituted an "application for a policy" under G. L. c. 175, § 108 (5) (*a*), where the insured's FEP application did not constitute an application for reinstatement of his existing policy, but was, rather, a new application for new benefits not provided in the original policy and for new consideration, and where the new application contained representations material to the insurer's underwriting decision; thus, the insurer's failure to ensure that the FEP application was attached to the FEP endorsement when issued, as required by G. L. c. 175, § 108 (5) (*a*), prevented the insurer from relying on an alleged misrepresentation in the application in order to deny coverage and attempt to rescind the FEP benefits. [881-886]

An insured's claims against an insurer under G. L. c. 93A and G. L. c. 176D failed for want of evidence. [886]

An insured was not entitled to collect the lump-sum present value of all benefits due to him in the future under his insurance policy, where there was no suggestion that the insurer was not able to pay the insured according to the contractually agreed-on benefit disbursement timetable, and where an award of such benefits was unduly speculative. [886-888]

An insured prevailing in an insurance coverage dispute failed to demonstrate that he was entitled to damages in both tort and contract for infliction of emotional distress. [888]

In the circumstances of an insurance coverage dispute, the judge correctly denied a prevailing party's motion for attorney's fees and costs. [888-889]

CIVIL ACTION commenced in the Superior Court Department on June 9, 1995.

---

[1]Provident Life and Accident Insurance Company (Provident), as successor-in-interest to John Hancock Mutual Life Insurance Company. The insurers are referred to collectively as "Hancock" or "insurer" throughout this opinion.

The case was heard by *Gordon L. Doerfer*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Robert J. Gilbert (Jeffrey B. Renton* with him) for the defendant.

*Edward S. Rooney, Jr.,* for the plaintiffs.

MARSHALL, C.J. We are asked in this case to consider the scope of G. L. c. 175, § 108 (5) (*a*),[2] which prohibits an insurer from rescinding a "policy of accident and sickness insurance,"[3] because of a statement made by an insured in his application for an insurance policy unless the application is attached to or endorsed on the policy when issued. Cf. *Opara* v. *Massachusetts Mut. Life Ins. Co.*, 441 Mass. 539 (2004) (*Opara*) (concerning cognate attachment statute for life insurance policies, G. L. c. 175, § 131). Specifically at issue is whether an insurer may rely on a statement made by an insured in his application for future earnings protection (FEP) benefits in order to deny coverage and attempt to rescind the benefit.

In 2000, a judge in the Superior Court, sitting without a jury, found for the insured, Julian Banerji, on the claim for rescission of John Hancock Mutual Life Insurance Company of FEP

---

[2]General Laws c. 175, § 108 (5) (*a*), provides, in relevant part, that an "insured shall not be bound by any statement made in an application for a policy unless a copy of such application is attached to or endorsed on the policy when issued as a part thereof."

[3]General Laws c. 175, § 108 (1), states: "The term 'policy of accident and sickness insurance' as used herein includes any policy or contract covering the kind or kinds of insurance described in subdivisions (*a*) and (*d*) of the sixth paragraph of section forty-seven." General Laws c. 175, § 47, Sixth (*a*), in turn, refers to insurance for "any person against bodily injury or death by accident . . . ." Disability insurance generally *is* viewed as a type of accident insurance. See 1 G. Couch, Insurance § 1:47 (3d ed. 1995 & Supp. 2005) (" 'Accident insurance' generally means a contract whereby one for . . . consideration agrees either to indemnify another against personal injury resulting from accident, or, in case death results, to pay a fixed sum as compensation therefor. The intention is ordinarily that the contract shall apply to all cases of disability which are the natural and ordinary results of external injury . . ."). Hancock does not dispute that the statutory attachment requirement, G. L. c. 175, § 108 (5) (*a*), applies to the original individual disability insurance policy issued to the defendant, or that disability insurance (as a broad category of insurance) is covered by the definition of "policy" under G. L. c. 175, § 47, Sixth (*a*).

benefits issued to Banerji.[4] Banerji was eligible to purchase the FEP benefit because he had purchased an individual disability policy from Hancock. The judge relied on the contractual language of the policy, although he acknowledged the potential applicability of G. L. c. 175, § 108 (5) (*a*).[5] The judge entered judgment for Banerji on his counterclaim to recover the FEP benefits due, but denied his other counterclaims.[6] Both parties appealed.

In a rescript opinion, the Appeals Court reversed the judgment with regard to rescission, awarding Hancock rescission of the FEP benefit. The Appeals Court thus found it unnecessary to decide Banerji's ancillary claims. *John Hancock Mut. Life Ins. Co.* v. *Banerji*, 62 Mass. App. Ct. 906, 909 (2004). Relying principally on *Opara, supra,* the Appeals Court held that neither the attachment statute, G. L. c. 175, § 108 (5) (*a*), nor the wording of Banerji's individual disability insurance policy required attachment of the application for the FEP benefit because that benefit was a supplement to Banerji's individual disability policy and not a "new and distinct policy." *Id.* at 908. We granted Banerji's application for further appellate review.

We affirm the judgment of the Superior Court on Hancock's rescission claim, although on different grounds from those relied

---

[4]Hancock issued the original individual disability insurance policy to Julian Banerji. At the time of trial, Provident had acquired Hancock's entire individual disability insurance line, including the individual disability policy and the FEP benefit issued to Banerji.

[5]Following discovery but before the trial, Banerji filed a motion in limine to exclude the FEP policy on the ground that G. L. c. 175, § 108 (5) (*a*), precluded Hancock from relying on Banerji's statements in his FEP application. Banerji raised his § 108 (5) (*a*) objection continuously throughout the trial.

[6]Specifically, the judge declared the FEP endorsement valid and enforceable. He ruled against Hancock and in favor of Banerji on the rescission issue, holding that Hancock's contract with Banerji required that a copy of Banerji's FEP application be attached to the FEP endorsement when the endorsement was issued. The judgment awarded contract damages to Banerji in the amount of $157,214.43 for past due FEP benefits, with interest and postjudgment interest; directed Hancock to pay future monthly additional FEP benefits to Banerji as they came due; and dismissed with prejudice, all appeal rights reserved, Banerji's cross claim for breach of the duty of good faith and fair dealing pursuant to G. L. c. 93A and G. L. c. 176D, his cross-claim for negligent and intentional infliction of emotional distress, and his request for reasonable attorney's fees and costs.

on by the judge. We conclude that G. L. c. 175, § 108 (5) (*a*), mandates that an insurer may not rely on an insured's statement in his application for FEP benefits where the insurer has not attached the insured's FEP benefit application to the endorsement at the time the endorsement is issued. Because G. L. c. 175, § 108 (5) (*a*) controls, we need not consider whether the original disability insurance contract at issue required Hancock to attach Banerji's FEP application to the FEP endorsement. In all other respects we affirm the judgment of the Superior Court. We remand the case to the Superior Court for further proceedings consistent with our opinion.

1. *Background.* We summarize the relevant factual findings from the judge's detailed and thoughtful memorandum of decision. This case concerns two applications submitted by Banerji to Hancock for disability insurance benefits. The first was an application for an individual disability insurance policy, which guaranteed the insured an income stream based on his existing income, together with a predetermined annual cost-of-living adjustment in the event that the insured became disabled and was unable to continue working at full salary.[7] The second application was for FEP benefits, which allowed the holder of an individual Hancock disability insurance policy to receive, for additional consideration, and subject to Hancock's underwriting requirements, monthly disability benefits (in addition to those provided by the individual disability insurance policy) as the annual income of the insured increased over time.[8]

In August, 1990, Banerji, through Hancock agent Jack Turgel, applied to Hancock for an individual disability insurance policy.[9] The Hancock application form required Banerji to provide details about his current medical condition, current

---

[7]The application form for these benefits is titled "Application for Individual DISABILITY Insurance to the John Hancock Mutual Life Insurance Company — Part A."

[8]The application form for these benefits is titled "John Hancock Mutual Life Insurance Company Application for Additional Benefits — Individual Disability and Health Insurance."

[9]"Unemployment insurance and disability insurance essentially protect against the same risk: inability of an individual to earn the salary or wages to which he or she was accustomed in the immediate past. While unemployment insurance protects against loss of income/employment due to a wide variety of causes, disability protects only against such losses that are attributable to poor

income, and current insurance coverage, including any disability insurance. As of the date of his application, Banerji was employed by Harvard University, which did not provide Banerji with disability insurance benefits, as Banerji noted on his application.

In September, 1990, while his application was pending, Banerji accepted a new position as a senior research scientist at Procept, Inc. (Procept). As a result of this change in employment, his salary rose from $25,000 to $47,000. He promptly notified Hancock of the change in employment and of his new salary. Hancock did not inquire whether Procept provided Banerji with disability insurance; Procept did in fact provide group disability insurance, but Banerji was unaware of this.[10]

On October 2, 1990, Hancock issued an individual disability insurance policy to Banerji. It provided for a monthly benefit of $1,500, with annual cost-of-living adjustments, in the event that Banerji became disabled and was unable to work. The policy, to which Banerji's application was attached, stated, among other things, that "[a] copy of your application is attached and is a part of this policy."[11] Banerji's individual disability policy also contained an FEP clause, which allowed him to apply annually for a term addition that would increase his monthly benefit amount if his earnings increased. Hancock was marketing the FEP benefit as "the single most important feature a disability policy can have."

In October, 1991, Banerji suffered a stroke. After a brief period of hospitalization, he returned to work at Procept full time and at full salary. Banerji did not apply for disability benefits at that time. In November, 1993, while still employed at Procept (albeit in a new position designed to accommodate

---

health." 1 G. Couch, Insurance § 1:65 (3d ed. 1995).

[10]On appeal, Hancock does not contest that Banerji was unaware of Procept's group disability coverage, either when Banerji submitted his FEP application or at any other time during his employment at Procept. There was evidence that Banerji's contract offer letter from Procept expressly mentioned "group life, health and dental insurance" as part of the compensation package, but did not mention group disability insurance coverage.

[11]When Banerji received the policy, he also received a preprinted "Copy of Application" endorsement, which stated: "Examine this copy carefully. If you find any error or omission, notify us at our Home Office immediately. Please explain fully the error or omission and give us your policy number."

his stroke-related physical limitations), Banerji submitted an FEP application to Hancock, using a Hancock preprinted form and having consulted with Turgel, an authorized agent of Hancock. See note 8, *supra*. In his application, Banerji requested an FEP benefit of $1,550 a month, which when added to the $1,500 monthly benefit already provided by his 1990 individual disability policy would provide Banerji with a total of $3,050 each month in the event he was unable to work due to disability. Hancock's FEP application form required Banerji to provide information about his annual income, his current access to disability insurance benefits, and whether he was currently disabled. As explained by Hancock, it required this information to avoid overinsuring its insureds in the event of a disability. On the FEP application he submitted to Hancock, Banerji stated that he did not have access to any disability insurance other than his existing Hancock individual disability insurance. See note 10, *supra*.[12]

In December, 1993, Hancock approved Banerji's FEP application, and Banerji's monthly premiums increased accordingly. Turgel then sent Banerji a letter containing the FEP endorsement, together with instructions that the endorsement should be attached to Banerji's 1990 individual disability policy. The letter did not refer to Banerji's FEP application, nor was a copy of the FEP application attached to or enclosed with the endorsement.[13] The judge concluded that, in order to save time and expense and to encourage its insureds to purchase the FEP benefit, Hancock streamlined its underwriting process. Among other things, Hancock never instructed its agents to return a copy of the FEP application with the FEP policy. Moreover, Hancock, mindful of inconveniencing those who purchased the FEP, never required the insured to return the original disability policy to Hancock so that the insurer could physically attach the FEP addendum to the original disability policy. The judge

[12]The FEP application did not require any additional medical underwriting information. For example, Banerji was not required to submit to a medical examination in order to be deemed eligible for the FEP benefit.

[13]At trial, Turgel stated that he had no reason to believe that the FEP application had not been attached to or enclosed with the FEP endorsement. The judge did not find Turgel's testimony to be credible on this point, and Hancock does not contest that finding on appeal.

concluded that "Hancock never informed Dr. Banerji, either in writing or orally, that a copy of his FEP [a]pplication should be attached to either the original policy or to the FEP addendum."

In August, 1994, Banerji left his employment at Precept.[14] In October, 1994, he submitted claims to Hancock for both the basic monthly individual disability benefit of $1,500 and the additional monthly FEP benefit of $1,550. After conducting an investigation, Hancock approved Banerji's claim for the $1,500 monthly benefit, but denied Banerji's claim for FEP benefits on the sole ground that, contrary to Banerji's statement in his FEP application, Banerji had disability insurance, provided by Precept, at the time he applied for the FEP benefit. Because the combination of the employer-provided group disability benefit, the basic Hancock individual disability benefit, and the additional FEP benefit exceeded Hancock's published participation limits, Banerji would not have qualified for the additional FEP benefit had Hancock been informed of the existence of Banerji's employer-provided group disability insurance. Hancock therefore notified Banerji that it was voiding the FEP benefit endorsement, and tendered to Banerji the premiums that he had paid for that endorsement. Banerji refused the tender.

2. *Application of the attachment statute.* Construing the cognate attachment statute applicable to life insurance policies that preceded G. L. c. 175, § 131, in 1905, this court held that the "language of the statute plainly has reference to an application upon which an original policy is issued, and not to any contract of revival." *Holden* v. *Metropolitan Life Ins. Co.*, 188 Mass. 212, 214 (1905) (*Holden*). See *Reidy* v. *John Hancock Mut. Life Ins. Co.*, 245 Mass. 373, 376 (1923) (concluding that application for reinstatement of lapsed insurance policy not subject to attachment statute). Relying in substantial measure on those two cases, Hancock argues the attachment statute at issue

---

[14]There is a dispute whether Banerji resigned or whether his employment was terminated. In the claim Banerji submitted to Hancock in October, 1994, for disability benefits, Banerji stated that the gradual onset of his stroke-related disability had led to his inability to continue working for Precept. As neither Precept nor Hancock contests Banerji's eligibility for disability benefits following his separation from Precept, we see no reason to assume that Banerji's job performance caused the termination of his employment. See *John Hancock Mut. Life Ins. Co.* v. *Banerji*, 62 Mass. App. Ct. 906, 907 (2004).

here, G. L. c. 175, § 108 (5) (*a*), is applicable only to the original policy, and that the Appeals Court was correct in characterizing the FEP benefit as "merely supplement[ing]" the original disability policy issued to Banerji in 1990, thus falling beyond the purview of the attachment statute. See *John Hancock Mut. Life Ins. Co.* v. *Banerji*, 62 Mass. App. Ct. 906, 908 (2004). Hancock points to a number of uncontested facts to support its position that the FEP benefit was "supplemental" to the 1990 policy, including that the FEP endorsement did not have a policy number separate from the 1990 policy, and that the FEP benefit was available only to holders of existing Hancock individual disability insurance policies. *Id.*

Hancock's position and the decision of the Appeals Court, however, run contrary to our holding in *Opara, supra.* In that case, the insured had allowed a $1 million whole life policy of insurance to lapse due to nonpayment of the premium. Subsequently, and after several medical procedures in which doctors had determined that he had a cancerous growth in his small bowel, the insured applied for reinstatement of the policy. On his reinstatement application, the insured misrepresented his physical condition. See *id.* at 542. The insurer approved the reinstatement application (as well as a subsequent application to change the policy from whole life to term life coverage), and sent the insured a reinstated policy to which his original application, but not his reinstatement application, was attached. *Id.* at 543. After the insured died, his beneficiaries sought payment under the reinstated policy, which the insurer refused based on the statements in the reinstatement application. *Id.* at 544. We held that, because of the insured's misstatements in his reinstatement application, the original policy was never reinstated. We held further that in such circumstances, the attachment statute did not prevent the insurer from refusing to pay benefits under the policy to the beneficiaries. *Id.* at 546-547. See *Holden* v. *Metropolitan Life Ins. Co., supra* at 214 (attachment statute does not apply to "any contract of revival").

Here, unlike in *Opara* and *Holden*, the insured did not apply for reinstatement of an existing (albeit lapsed) policy; instead, he applied for a new, separate, and distinct layer of disability protection, in the form of new benefits not provided under his

1990 policy. There are significant differences between applications for reinstatement (or revival) and applications for additional benefits, the crucial one being that an insured who applies for reinstatement seeks merely to reacquire coverage that he previously held (in other words, to revive the status quo ante), whereas an insured who applies for additional benefits seeks to acquire new coverage he has not had before. In *Opara*, we noted that one key reason the insurer was entitled to rely on the insured's misrepresentations (despite having failed to attach the revival application to the revived policy) was because the insured "did not submit a new application for insurance[,] [n]or did he separately pay for the term life insurance coverage." *Id.* at 546.

The situation here is different. To obtain his additional FEP benefits, Banerji was required to submit a new application,[15] which required him to make new representations to Hancock concerning his income and access to disability insurance. This information, as Hancock forthrightly recognizes, was material to the level of coverage that Hancock would be willing to provide if it accepted Banerji's application. Stated differently, Banerji had to negotiate new terms of an insurance contract by establishing that he qualified for the FEP benefit, both by showing that he was earning more income and by demonstrating that he had no other disability coverage. He was not merely exercising an option under the existing policy that would allow him to obtain additional benefits automatically on the payment of additional premiums. Cf. *Reidy* v. *John Hancock Mut. Life Ins. Co.*, *supra* at 376 (application for reinstatement of lapsed policy not subject to the attachment statute; insured was not negotiating for a "new contract," but "to restore . . . all his rights under the policy . . . as if he never had been in default"). Finally, Banerji had to provide new monetary consideration for the FEP benefit: once his application for the FEP benefit was accepted by Hancock, his annual premiums doubled, from $700 to $1,400. See *Gem State Mut. Life Ass'n* v. *Gray*, 77 Idaho 157, 163 (1955) (while "accidental death supplement" to life

---

[15]We are not persuaded by Hancock's attempt to characterize this submission as a "request" rather than an "application." As noted earlier, note 8, *supra*, the Hancock form was titled an "application" for additional benefits.

insurance policy "became a part of the original contract of insurance," it provided "additional insurance separate and apart from that provided by the original policy, for which a separate and additional consideration was agreed on and paid. Thus, it is in effect a severable and independent part of the original contract. The situation is analogous to cases in which separate or additional insurance is given to a vendor or mortgagee upon an additional or independent consideration").

Where there was a new application for new benefits not provided in the original insurance contract and for new consideration, and where that new application contained representations material to Hancock's underwriting decision, the FEP application was an "application for a policy" as that term is used in G. L. c. 175, § 108 (5) (*a*). See 2 G. Couch, Insurance § 18:8 (3d ed. 1995 & Supp. 2005) ("A statutory requirement that the application be attached to the policy does not require attachment of a supplemental application which contains no new matter of material import. Where, however, substantial amendment of the application takes place, the amended application or other documents containing the amendments must be attached to the policy"). See also G. L. c. 175, § 108 (1) (defining "policy of accident and sickness insurance" as including "any policy *or contract*" [emphasis supplied]). Hancock may rely on Banerji's statements in his application for FEP benefits if, and only if, Hancock attached the FEP application to the issued FEP endorsement.[16] See *Pahigian* v. *Manufacturers' Life Ins. Co.*, 349 Mass. 78, 84 (1965) ("Where the insurer fails to attach a correct copy, it cannot rely in an action against it on the policy, on misstatements in the application as a defence"); *Salisbury* v. *Monumental Life Ins. Co.*, 1 F. Supp. 2d 97, 100 (D. Mass. 1998), quoting *Albro* v. *Manhattan Life Ins Co.*, 119 F. 629, 632 (C.C.D. Mass. 1902), aff'd, 119 F. 281, cert. denied, 194 U.S. 633 (1904) ("where the alteration or omission of the application would affect the rights of the parties, 'no tribunal has the right to say the statute does not apply' ").

---

[16]Contrary to the Appeals Court's analysis, *Holden* v. *Metropolitan Life Ins. Co.*, 188 Mass. 212, 214 (1905), does not stand for the broad proposition that the attachment statute applies *only* to applications for an "original" policy. Rather, the *Holden* court addressed the narrower question whether the attachment statute applied to an application for *revival* of a policy.

Our analysis is bolstered by the purpose of attachment statutes such as G. L. c. 175, § 108 (5) (*a*), and G. L. c. 175, § 131 (applicable to life insurance policies). The requirement that an insured's application be attached to the policy primarily protects the insured by giving him the opportunity to "correct material errors in the application." W. F. Meyer, Life and Health Insurance Law § 6:8, at 144 (1971). See *Schiller* v. *Metropolitan Life Ins. Co.*, 295 Mass. 169, 173 (1936) (purpose of attachment is to "furnish to every person holding insurance . . . a copy of the application, upon which the effectiveness of the policy may in some circumstances depend, so that he may know the exact terms of the contract"); 2 G. Couch, Insurance § 18:6 (3d ed. 1995) (purpose "is to guarantee that the insured is in possession of the entire contract"). The attachment requirement also serves to secure the right of the insurer to rely on any material misrepresentations made by the insured in the application, because the representations of an insured form the basis of the decision to underwrite. This dual purpose of the statute — to protect both the insured and the insurer — would be defeated if we were to construe the attachment requirement to permit an insurer to rescind the FEP benefit based on the misstatements in the insured's FEP application when the insured had no opportunity to review (and correct, if necessary) such misstatements when the policy was issued. See *Sandberg* v. *Metropolitan Life Ins. Co.*, 342 Pa. 326, 328-329 (1941) (insured "is entitled to have the whole application before him, if any part of it is to be used against him as a defense").

Hancock's argument that the FEP benefit should be analyzed under the reinstatement exception in G. L. c. 175, § 108 (5) (*a*), is unavailing.[17] False material statements by an insured in a reinstatement application subject an insurer to an unreasonable

---

[17]General Laws c. 175, § 108 (5) (*a*), as concerning applications for reinstatement or renewal, states: "If any such policy delivered or issued for delivery to any person in the commonwealth shall be reinstated or renewed, and the insured or the beneficiary or assignee of such policy shall make written request to the insurer for a copy of the application, if any, for such reinstatement or renewal, the insurer shall within fifteen days after the receipt of such request at its home office or any branch office of the insurer, deliver or mail to the person making such request, a copy of such application. If such copy shall not be so delivered or mailed, the insurer shall be precluded from introducing such application as evidence in any action or proceeding based

amount of underwriting risk because the insurer expects to insure the individual applying for reinstatement on the same terms as those on which the parties originally agreed. The Legislature has explicitly shielded insurers who issue policies of "accident and sickness insurance" from this risk by allowing insurers to rely on the representations in reinstatement or revival applications without requiring attachment of the application to the reinstated policy when issued. See G. L. c. 175, § 108 (5) (*a*).[18] The Legislature has not similarly shielded insurers who provide new and additional benefits to the insureds of such policies, i.e., an insurance product affirmatively designed to reflect a change in the status quo, in this case a product providing additional benefits when the insured's income increases. The information requested by Hancock and provided by Banerji was not a reaffirmation of information previously provided in order to revive an existing benefit. It was new information sought and provided for the purpose of enabling Hancock to approve or deny new benefits. General Laws c. 175, § 180 (5) (*a*), permits two exceptions to the attachment requirement: reinstatement or renewal of an insurance policy. See note 17, *supra.* Neither circumstance pertains here.

3. *Remaining claims.* We may summarily dispose of Banerji's remaining claims. First, we agree with the judge that the evidence at trial demonstrated that Hancock acted in good faith and reasonably in investigating and disputing Banerji's claim for FEP benefits. Banerji's claims under G. L. c. 93A, and G. L. c. 176D, therefore fail for want of evidence. See *Buster* v. *George W. Moore, Inc.,* 438 Mass. 635, 642-644 (2003) (judge's findings supported by evidence will be upheld on appeal unless there is clear error).[19]

Second, we agree with the judge that Banerji is not entitled

---

upon or involving such policy or its reinstatement or renewal."

[18]The cognate attachment statute applicable to life insurance policies, G. L. c. 175, § 131, does not contain similar statutory protections for insurers with respect to the reinstatement or reversal of a life insurance policy.

[19]Banerji argues that Hancock's failure to investigate the veracity of his statements in his FEP application until after he submitted a claim for FEP benefits amounts to unfair "post-claim underwriting." "Post-claim underwriting" is the alleged practice of an insurer's failure to engage in adequate underwriting until after a claim is submitted, and subsequently denying the claim on the basis that the insured is not entitled to the policy. See *Banks* v.

to collect the lump-sum present value of all FEP payments due to him in the future. Banerji's reliance on *Parker* v. *Russell*, 133 Mass. 74 (1882) (lump-sum present value awarded for total breach of contract), and *Commissioner of Ins.* v. *Massachusetts Acc. Co.*, 314 Mass. 558 (1943) (lump-sum present value awarded where insurer insolvent), is misplaced. See 9 A. Corbin, Contracts § 969, at 790 (interim ed. 2002) (even if "the action of the insurer amounts to a 'total' breach . . . it does not follow necessarily that the injured party should be given a judgment for the present value of that uncertain number of future instalments that will fall due while the insured lives and remains disabled"). Banerji's FEP policy remains an enforceable contract, and there is no suggestion that the insurer is not able to pay Banerji according to the contractually agreed-on benefit disbursement timetable. Moreover, as the judge carefully explained in his memorandum of decision (and again in his memorandum on Banerji's motion to amend or vacate findings on presumptive disability), Banerji does not suffer from "total disability" as defined in his disability policy.[20] Any award of a lump-sum payment would therefore be unduly speculative. We see no reason to depart from the general rule that future instal-

---

*Paul Revere Life Ins. Co.*, 31 F. Supp. 2d 82, 85 (D. Conn. 1998). To accept Banerji's argument that Hancock was obligated to investigate all of Banerji's (or any other insured's) statements on an FEP (or any other) application for insurance benefits when submitted would impose an enormous burden on insurers, a burden that attachment statutes are designed in part to obviate. It appears from the record that Hancock did nothing more than undertake a routine evaluation of Banerji's claim when the claim for disability payments was submitted. It was entitled to do so here.

[20]Banerji's individual disability insurance policy states, under the heading "Presumptive Disabilities," that "[y]ou will be presumed to be disabled if injury or sickness causes total and permanent loss of any of the following: . . . Your use of one hand and one foot." In his notice of appeal, Banerji appealed from the judge's determination that he is not "presumptively disabled" but makes no argument to that effect. See *Haufler* v. *Zotos*, 446 Mass. 489, 499-500 n.25 (2006) (argument not raised on appeal is waived); Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975) ("The appellate court need not pass upon questions or issues not argued in the brief"). Even if the issue is not waived, the judge's finding has support in the record and is not "clearly erroneous." Mass. R. Civ. P. 52 (c), as appearing in 423 Mass. 1408 (1996). See *Secretary of Envt'l Affairs* v. *Massachusetts Port Auth.*, 366 Mass. 755, 774 (1975) (in nonjury cases findings of fact are not set aside unless clearly erroneous).

ments under a contract cannot be accelerated. See *Badger* v. *Titcomb*, 15 Pick. 409, 413-414 (1834).

Banerji also seeks damages in both tort and contract for infliction of emotional distress, pointing to testimony concerning the stress and emotional problems that Banerji and his wife suffered when Hancock refused to pay the FEP benefits. Hancock argues that these issues are not adequately preserved. But we need not resolve that question as we conclude that Banerji is not entitled to such damages on either basis. The judge denied the tort claim, concluding that the insurer had not engaged in any conduct that was "extreme and outrageous." *Haddad* v. *Gonzalez*, 410 Mass. 855, 871 (1991). We agree. His careful findings are not challenged by Banerji, and his conclusion is fully consistent with these findings.

As to the contract claim for emotional distress, damages for mental suffering are generally not recoverable in an action for breach of contract. See, e.g., *McClean* v. *University Club*, 327 Mass. 68, 76 (1951); *St. Charles* v. *Kender*, 38 Mass. App. Ct. 155, 159-161 (1995). See also Restatement (Second) of Contracts § 353 (1981). Damages for emotional distress may be recovered if they result from physical harm, *DiGiovanni* v. *Latimer*, 390 Mass. 265, 271 (1983), or are the result of intentional or reckless conduct of an extreme and outrageous nature, *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976). The judge concluded that the insurers acted fairly (if incorrectly) in denying payment of the FEP benefit, and there is nothing inherent in the coverage provided by an insurance policy for FEP benefits that would put an insurer on notice that emotional distress would be a foreseeable result of its good faith decision to deny a claim. Cf. *Sullivan* v. *O'Connor*, 363 Mass. 579, 587 (1973) (foreseeable distress damages recoverable in action for breach of contract in respect to cosmetic operation on plaintiff's nose). The judge was correct to deny emotional distress damages.

Finally, Banerji seeks recovery of his attorney's fees and costs. In *Wilkinson* v. *Liberty Mut. Ins. Co.*, *ante* 663 (2006), we recently affirmed that we adhere to the traditional rule that each party to litigation in an insurance coverage dispute is responsible for his own attorney's fees and costs. See *Waldman*

v. *American Honda Motor Co.*, 413 Mass. 320, 321 (1992). Contrast *Preferred Mut. Ins. Co.* v. *Gamache*, 426 Mass. 93 (1997) (where dispute with insurer concerns "duty to defend," an award of attorney's fees may be proper). The judge correctly denied Banerji's request for attorney's fees and costs.

4. *Conclusion.* The judgment of the Superior Court is affirmed. The case is remanded to the Superior Court for a calculation of damages for the FEP benefits past due, together with prejudgment and postjudgment interest, and for such other and further relief as may be required, consistent with this opinion.

*So ordered.*